*April, 1831.*

Disborough
v.
Outcalt et al.

JOHN H. DISBOROUGH v. JOHN OUTCALT and others.

O. contracted with H. and B. for the purchase of a lot of land, procured ma-
terials, and borrowed money, which he applied to the erection of mills and
improvements on the property; but becoming embarrassed, and these debts
remaining unpaid, H. and B., at the request of O., conveyed the property to
his son-in-law P.; who gave his own bonds and mortgages on the premises
for the purchase money for the land, the cost of materials, and money bor-
rowed to erect the buildings; and agreed in writing that O. might redeem
the property, by reimbursing the monies so secured. This gave O. an equi-
table right; he was at liberty to take the property, on paying the purchase
money and the incumbrances: and if at any time he had done this, he might
have compelled a conveyance from P.

While things remained in this situation, O. confessed a judgment to D., upon
which execution was taken out, and levied on the right of O. in this pro-
perty; after which, in consideration of another debt due from O. to N. B.,
for money advanced to complete these improvements, P. conveys the pro-
perty to N. B. in fee, subject to the mortgages. The right of O. in the pro-
perty was subsequently sold by the sheriff, on the judgment and execution of
D., and conveyed to D., who became the purchaser. In this case, O. never
having had the legal estate in the premises vested in him, not having paid
the purchase money, or executed his contract, and not being in a situation
to demand a deed, had a mere equitable interest or trust, not subject to the
operation of a judgment and execution at law, which could not be sold and
conveyed by the sheriff; and the conveyance passed no title to D.

At law, a judgment and execution constitute no lien on mere equitable rights,
which are not susceptible of delivery, or possession: they operate on legal
rights only; there must be a *seisin*, and this term always has reference to a
*legal* title. The same principle is established in reference to mere equita-
ble interests in personal property; they are not subject to levy and sale.

On this subject the decisions in courts of equity are in accordance with those
at law; they consider the rights growing out of a judgment and execution at
law, as *legal* rights: and while this court will, on various principles of
equity, aid the courts of common law in the prosecution of legal rights, it
will not undertake to enlarge or extend them.

Courts of equity will, in some cases, aid execution creditors to obtain satisfac-
tion of their demands. But to warrant its interference, there must be some
equitable ground presented; the case must be infected with fraud, or it must
involve some trust or other matter of peculiar equity jurisdiction.

When a party comes into this court to obtain satisfaction of a judgment, he
must present himself under some head of equity jurisdiction: he must show
that the debtor has made some fraudulent disposition of his property, or that
the case stands infected with some trust, collusion or injustice, against
which it is the province of this court to give relief.

In cases of fraudulent transfers or assignments, the court will consider the conveyance as void, and the property as bound by the judgment and execution; and will give effectual relief to the diligent creditor.

It will interfere to remove equitable incumbrances, standing in the way of the parties' claim at law; and being once possessed of the case, it will ascertain and settle the rights of all parties concerned.

In cases of *direct trust*, such as mortgages of real estate, and pledges of personal property, the court will give aid on its own peculiar principles.

An execution creditor at law, has a right to come into this court and redeem an incumbrance upon a chattel interest, in like manner as a judgment creditor at law is entitled to redeem an incumbrance upon the real estate; and the party so redeeming will be entitled to a preference according to his legal priority.

A party, by his execution at law, obtains no vested interest in mere equitable rights, such as this court will aid him in securing; unless they are connected with some fraudulent or colourable disposition of property; or some direct trust, where the contract has been executed and the *cestui que trust* is in a situation to call on the trustee for the property; or where there is a right of redemption, as in cases of pledges or mortgages.

T. contracts to sell to O. forty acres of land for four hundred dollars, half of which was paid at the time, and the other half to be paid on the delivery of a deed: T. transfers all his right in the article of agreement, and the money due on it, to G., and furnishes him with a deed, to be delivered to O. on the payment of the money; G. tenders the deed to O. and demands payment, which is refused: G. then assigns the agreement to D.: D. obtains judgment and execution against O. for another debt, under which the right of O. in the premises is sold and conveyed by the sheriff to D.: D. in his bill now prays, that T. may be decreed to convey, and O. to release to him, all their right in the premises. In this case the legal right to the premises was not transferred to D. by the assignment of the agreement; nothing passed by it but the right to raise the two hundred dollars of purchase money remaining due.

D. acquired no title by the sheriff's sale of the right of O., because no title was vested in him; his right, under the agreement, being that of a purchaser under a contract unexecuted. D. can have no relief under the present bill.

*Semble.* That D. might have had a decree for a specific performance, on a bill filed for that purpose, against all parties concerned.

April, 1831.

Disborough
v.
Outcalt et al.

J. OUTCALT contracted with J. R. Hardenburgh and J. H. Bostwick for the purchase of a lot of land; he took possession of it, and erected mills and made other improvements thereon, and has since continued to occupy and use it as his own. Being embarrassed, and not having paid the purchase money for the lot,

April, 1831.

Disborough
v.
Outcalt et al.

being also indebted for the materials for the buildings, and money borrowed to pay the expense of erecting them; the property, at his request, was conveyed by Hardenburgh and Bostwick to Pierson (Outcalt's son-in-law) who gave his own bonds and mortgages on the premises, to Hardenburgh for part of the purchase money and the cost of materials, and to the trustees of Rutgers college for money borrowed to pay for erecting the buildings; in which it was said, and not denied, that a portion of the purchase money was also included; and agreed that Outcalt might redeem the premises on reimbursing the monies so paid. Outcalt being farther indebted to the bank of New-Brunswick, for money had from time to time to complete the improvements on the property, Pierson, with his consent, conveyed the property to the bank, in fee, subject to the prior mortgages, in satisfaction of this debt to the bank.

Outcalt had also contracted with G. Taylor for the purchase of another lot of forty acres, for four hundred dollars; half of which was paid, in notes, at the time, and the other half to be paid on the delivery of the deed. Taylor assigned all his right in this agreement, and the money due thereon, to W. Gordon, and delivered him a deed for the premises, to be delivered to Outcalt on the payment of the money. Gordon tendered the deed to Outcalt, and demanded payment of the money, which was refused. Gordon then transferred the agreement to Disborough, the complainant.

After this, while the title to the mill lot was in Pierson, before his conveyance to the bank, Disborough obtains judgment against Outcalt for an old debt; upon which execution was issued and levied on all the right of Outcalt in both these lots; and after the conveyance of the mill lot by Pierson to the bank, the right of Outcalt in both lots was sold under the execution, and conveyed by the sheriff to Disborough, who became the purchaser for two hundred and fifty dollars.

Disborough thereupon filed his bill in this court, against Outcalt, Pierson, the bank of New-Brunswick, the trustees of Rutgers college, Hardenburgh and Taylor; praying, as to the mill lot, that the conveyance to Pierson, and by him to the bank, might be set aside as fraudulent and void against the complainant, and that the possession of the premises might be delivered up to him: and

as to the other lot, that Taylor might be decreed to convey, and Outcalt to release, to him, all their right in the premises.

Answers were put in by Hardenburgh, Outcalt, Pierson, and the bank, and witnesses were examined. The facts, as far as they are material, appear in the opinion of the court. The case was argued by

*Th. Frelinghuysen*, for the complainant;

*C. L. Hardenburgh* and *G. Wood*, for the defendants.

Cases cited:—For complainant; *Rev. L.* 148, *s.* 1, 2; *ib.* 430, *s.* 1, 2; *ib.* 433, *s.* 12; 4 *Grif. L. R.* 1225–6; 3 *John. C. R.* 216; 4 *John. C. R.* 450, 454; *ib.* 671; *ib.* 687; *Amb. R.* 79; *ib.* 596; 7 *John. C. R.* 208; 5 *John. C. R.* 280; 17 *John. R.* 351; 20 *John. R.* 504; 7 *Bac. Ab. Trust A.*

For defendants: *Bac. Ab., Execution, C.*; 1 *John. C. R.* 52–5; 1 *Hop. R.* 59; 5 *Hal. R.* 193, 201; 18 *John. R.* 98; 7 *John. R.* 206; 8 *East. R.* 467; 5 *Bos. and P.* 461–2; 5 *John. R.* 335–45; 3 *John. R.* 222, *n.* 6; 1 *John. C. R.* 16; 2 *John. C. R.* 312; *ib.* 283; 2 *Ves. jr.* 95; 1 *Ves. jr.* 196; 1 *Ans.* 381; 1 *Cain C. E.* 64; 2 *Atk. R.* 600; 3 *Atk. R.* 192, 356.

THE CHANCELLOR. It appears from the pleadings and evidence in this cause, that prior to May, 1824, John Outcalt, one of the defendants, contracted with John H. Bostwick and Jacob R. Hardenburgh, for the purchase of a lot of land and premises, of about forty acres, in the township of South Amboy, in the county of Middlesex; and that being in embarrassed circumstances, he caused the deed for the said property to be made out to his son-in-law, Daniel P. Pierson, with the consent of the said Pierson. The object of Outcalt, as stated in his answer, was, that he might "procure some property on which to reside : that being unable himself to purchase property, and destitute of money, his son-in-law agreed to become the purchaser, and took the deed for the same in his own name." It does not appear what was the amount of the purchase money, but as the property was

April, 1831.

Disborough
v.
Outcalt et al.

in an unimproved state at that time, it is probable the sum to be paid for it was not large.

The contract for this property was made some considerable time before the deed was given to Pierson. In the mean time, Outcalt was in possession. He erected a grist mill and snuff mill, and made other improvements, which greatly enhanced the value of the property. In making these improvements, Outcalt became indebted to Hardenburgh for materials. To secure this debt, and also a part of the purchase money, Pierson, on the 6th day of May, 1824, executed to Hardenburgh a mortgage on the premises for one thousand dollars, which was duly registered. On the same day, Pierson gave his bond and a mortgage on the same property to the trustees of Rutgers college, for the sum of two thousand dollars. This sum was appropriated by Outcalt for the payment of the improvements before mentioned. The deed to Pierson bears date on the 4th, and the mortgages to Hardenburgh and the trustees of Rutgers college on the 6th May, 1824.

Previous to this period, Outcalt became indebted to the complainant for goods, wares and merchandize, money lent, &c. to a considerable amount; and on the 4th of October, 1825, confessed a judgment to him for one thousand four hundred and sixteen dollars and seventy cents. On this judgment an execution issued in March, 1826; and on the 31st August, 1826, the sheriff of the county of Middlesex sold the right and interest of Outcalt in this property, and also in a certain other lot of about forty acres, situate in the same county; and the complainant became the purchaser, for the sum of two hundred and fifty dollars. The sheriff's deed bears date on the 19th September, 1826.

It appears further, that in order to complete the improvements, Outcalt procured money at various times from the bank of New-Brunswick, and that for the purpose of securing the payment of said sums, Pierson, on the 5th August, 1826, executed to the bank a deed in fee simple for the first mentioned property. This deed was subsequent to the judgment and execution of Disborough, the complainant, and prior to the sale and sheriff's deed.

It appears also, by the answer of Pierson, that he executed a paper, agreeing to give Outcalt a right of redemption to the property, when he, Pierson, should be reimbursed. This paper is

missing, and cannot be produced ; nor is it known to the court at what time it was given.

A part of the mortgage money was paid to Hardenburgh on his mortgage, but it is not shown who paid it; and the interest on the mortgage to the trustees of Rutgers college remained unpaid until after the conveyance of the property to the bank of New-Brunswick, when it was settled by the bank.

Under these circumstances the complainant comes into this court for relief, and prays that the deed from Bostwick and Hardenburgh to Pierson, may be decreed fraudulent and void as against the creditors of Outcalt, and especially as against the complainant; and also that the conveyance from Pierson to the bank may be declared void as against the complainant, and they be decreed to render to him the possession of the said property.

On this part of the case the controversy is between the complainant and the bank of New-Brunswick. It is admitted on both sides, that the mortgages to Hardenburgh and the trustees of Rutgers college must be paid. They were given by the person holding the legal title, and before the judgment and execution of the complainant, and of consequence before he could have had any lien on the premises.

With this brief view of the leading facts of the case, I propose to inquire, in the *first place*, what was the nature of Outcalt's right in the property, at the time Disborough levied on it by virtue of his execution.

I think there is no doubt that Outcalt originally contracted with Hardenburgh and Bostwick for the property. It is not in evidence that he paid any part of the purchase money. It is probable, from circumstances, that most of the improvements were made by Outcalt, while he held the property under contract. They were doubtless made for his own benefit, as he states in his answer. It appears, however, that no part of these improvements were paid for by Outcalt; and that after the deed was made to Pierson, in May, 1824, whereby he became the legal owner of the property, he gave his own bonds to the trustees of Rutgers college for the monies that had been borrowed of them for the purpose of erecting the improvements ; and also gave to Hardenburgh his own bond for the money due him for materials, in

which bond was included part of the original consideration given for the property. These bonds were both secured by mortgages on the property. The legal estate then was in Pierson. He received the conveyance from the grantors; and he was personally bound, not only for a portion of the original purchase money, but for the value of all the improvements. Outcalt, nevertheless, was in possession of the property. He had the management and control of it, and reaped the benefit. And there was an agreement that Outcalt should have the right of redeeming the property when Pierson should be reimbursed. This gave to Outcalt an equitable right. He was at liberty to take the property, on paying the purchase money and the incumbrances; and if at any time he had done this, he might have compelled a conveyance from Pierson.

Such was the situation of things, and such the nature of Outcalt's right, when he confessed the judgment to Disborough, and when Disborough levied on the property. The right of Outcalt rested merely in equity. He had never paid off the incumbrances, and thereby placed himself in a situation to demand a title at the hands of Pierson.

What then, *in the second place*, was the effect of the proceedings against Outcalt; and what rights or advantages, if any, did they secure to the complainant?

Considering the interest of Outcalt as strictly an equitable interest, it could not be legally operated on by the judgment, levy, or sale. I take the principle to be settled, that at law, a judgment and execution constitute no lien on mere equitable rights. They are not susceptible of delivery or possession. The words of our act of assembly making lands liable to be sold for the payment of debts, though broad, do not embrace them: *Rev. Laws*, 433. By the first section, all lands, tenements, hereditaments and real estate, are made liable to be levied on and sold by execution; and by section twelfth the sheriff is directed to make to the purchaser "as good and sufficient a deed or conveyance for the lands, tenements, hereditaments and real estate so sold, as the person against whom the writ or writs of execution were issued might or could have made for the same, at or before the time of rendering judgment against him." It was contended at the bar that these words were

sufficiently comprehensive to embrace equitable estates; and the opinion of Mr. Griffith, in the 4th vol. of his *Law Reg.* 1225–6, was cited to sustain the argument. The learned editor of that valuable work gives a very decided opinion, that trust estates may, under our statute, be levied on and sold by execution. I have not so understood the law. Judgments and executions operate on legal estates only. There must be a *seisin,* and this term always has reference to a *legal title.* Under the statute of Westminster 2d, (13 Ed. I. c. 18,) it was always held that a trust estate could not be extended. The power was given by the 29th Cha. II. ch. 3. This statute has not been re-enacted in this state, and the provisions of our act, before recited, do not embrace it. In the state of New-York, lands held in trust may be seized on a fi. fa. against cestui que trusts, but that is by special statute. In the case of *Foote and Litchfield* v. *Colvin and al.* 3 *Johns. R.* 222, Spencer, J., seemed to think that a trust property might be sold without the aid of the statute. And in the case of *Jackson* v. *Parker,* 9 *Cowen,* 73, this opinion is approved. But in this state a different doctrine is maintained. In the late case of *Den* v. *Steelman,* 5 *Hals.* 193, it was held that a purchaser at sheriff's sale had not, before the delivery of the sheriff's deed, such an interest in the property as could be seized on and sold by execution. This case was decided upon full deliberation, and if there was any doubt before, may be considered as entirely removing it.

The same principle is established in reference to mere equitable interests in personal property. They are not subject to levy and sale. In *Scott* v. *Scholey,* 8 *East.* 467, the court of king's bench held, that a mere equitable interest in a term of years could not be taken in execution by the sheriff under a writ of fi. fa. ; and Ld. Ellenborough, C. J., said that no single instance was to be found in the courts of common law in which such an equitable interest had ever been recognized as saleable under a fi. fa. And in *Wilkes and Fontaine* v. *Ferris,* 5 *Johns.* 335, it was decided that where personal property had been assigned for the payment of certain debts, that the residuary interest remaining in the assignor after the purposes of the assignment were fully answered,

*April, 1831.*

Disborough
v.
Outcalt et al.

39

was not such an interest as could be taken and sold on execu tion.

The decisions in equity on this subject are in accordance with those at law. They consider the rights growing out of a judgment and execution at law as legal rights; and while this court will, on various principles of equity, aid the courts of common law in the prosecution of legal rights, it will not undertake to enlarge or extend them. In the case of *Bryant* v. *Perry*, 1 *John. C. R.* 56, Chancellor Kent recognized the principle that a judgment at law is no lien on a mere equitable interest in land; and the execution under such judgment will not pass an interest that a court of law cannot protect and enforce. And in 2 *J. C. R.* 312, *Hendricks* v. *Robertson*, the same chancellor says, "I do not know of any case in which a court of equity has considered an execution at law as binding an equitable right. The idea is altogether inadmissible. If the execution cannot sell, there is no reason why it should affect or bind a mere equity, and the doctrine would be equally inconvenient and absurd." The correctness of this doctrine is admitted by Chancellor Sanford, in the case of *Donovan* v. *Finn, Hopk.* 74. See also on this subject *Dundas* v. *Duters*, 1 *Ves. jr.* 196; *Utterson* v. *Mair*, 2 *Ves. jr.* 95; *Cailland* v. *Estnick, Anst.* 381.

But the present case is peculiar, and would require great liberality on the part of the court to bring it within the rule contended for. The purchase money is not paid by Outcalt. The improvements are not paid for, and the amount of them is secured on the property. He was not, at the time of the judgment and execution, in a situation to demand a deed. His contract was unexecuted, and his interest rested merely in contingency. An interest or trust of so complicated a character, is not a proper subject matter to be operated on by an execution at law.

Taking it for granted, therefore, that the proceedings against Outcalt had no legal operation, and passed no estate to the purchaser, the question still recurs, what rights and advantages, if any, did they secure to the complainant? Was the equitable right of the defendant, Outcalt, *attached*, if I may make use of the term, by the judgment or execution, or did they operate as an equitable lien on it, so as to give them a preference to the claim

of the bank, and render the conveyance to the bank illegal and invalid ? The question, how far mere equitable rights, property not tangible by an execution at law, may be reached by this court, independent of fraud, trust, or some other distinct ground of equity jurisdiction as a foundation for the interference, has often been agitated in the courts, and in some instances the decisions can scarcely be reconciled. The later opinion of Ch. Kent appears to have been, that the power of the court was sufficient to reach them : *Bayard* v. *Hoffman*, 4 *John. C. R.* 450. And in the recent case of *Egberts* v. *Pemberton*, 7 *John. C. R.* 208, the court seemed to consider that a judgment debt, being a demand reduced to a certainty, might, without any very great stretch of presumption, be looked on as so much money *held in trust ;* and at the instance of a creditor, the plaintiff in the judgment was restrained from collecting the money on the execution. But on a careful examination of the cases, I incline to think that such a result is not fairly deducible from them, and that the opinion is not well founded.

April, 1831.

Disborough
v.
Outcalt et al.

Courts of equity will, in some cases, aid execution creditors to obtain satisfaction of their demands. It has for this purpose a suppletory power. But to warrant its interference, there must be some equitable ground presented. The case must be infected with fraud, or it must involve some trust or other matter of peculiar equity jurisdiction. The court will then act on its own established principles, and afford such relief as the situation of the parties requires and the nature of the case will admit.

It is on one or other of these grounds that the courts of equity have usually proceeded. In *Taylor* v. *Jones*, 2 *Atk.* 600, there was a voluntary conveyance of government stock made by a man to trustees, for the benefit of his wife and children ; but being made after marriage, and not in consideration of marriage, it was held fraudulent. And the question was not, whether property of that kind could be reached by the court, but whether the assignment was fraudulent under the statute of 13th Elizabeth. The case of *Partridge* v. *Goff*, *Amb.* 596, was decided expressly on the ground of fraud. There was a voluntary gift for the purpose of defeating creditors, and Ld. Northington held that no man has such power over his property as to dispose of it to defeat creditors,

unless for consideration. The case was within the statute of frauds. Even the case of *Bayard* v. *Hoffman*, 4 *John. C. R.*, in which Ch. Kent assumes the principle, (on the strength of the cases above cited,) that the property might be reached without fraud, was the case of a voluntary settlement by an insolvent debtor, which was admitted to be void under the statute.

In cases of fraudulent transfers or assignments, the court will look on the property as bound by the judgment and execution, and will give effectual relief to the diligent creditor. See the case of *Hadden* v. *Spader*, 20 *John. R.* 554, and the authorities there cited.

So, likewise, in cases of direct trusts, such as mortgages of real estate, and pledges of personal estate, this court will give aid on its own peculiar principles. It will interfere to remove equitable incumbrances standing in the way of the party's claim at law; and being once possessed of the case, it will proceed to ascertain and settle the rights of all parties concerned. There can be no doubt that "an execution creditor at law has a right to come into this court and redeem an incumbrance upon a chattel interest, in like manner as a judgment creditor at law is entitled to redeem an incumbrance upon the real estate; and the party so redeeming will be entitled to a preference according to his legal priority." 4 *John. C. R.* 692.

I am fully aware that some cases in New-York appear to have carried the power of the court so far as to reach equitable interests in the hands of third persons, where there was no fraud, and where the property could not be considered as held in pledge or mortgage. But most of the cases, when examined, will appear to have been infected with fraud. Even in the case of *Hadden* v. *Spader*, 20 *John. R.* 564, (which has been so much relied on,) Mr. Justice Woodworth, who carried the argument to the greatest extent, put himself upon this principle, that a debtor who had *placed his funds* in the hands of a trustee, where they could not be reached by an execution at law, could not put his creditors at defiance and enjoy the benefit of those funds; but that they ought to be appropriated to the payment of his debts. And Justice Platt rests his opinion on the ground that the assignment was fraudulent, and on that principle was willing that the

April, 1831.

Disborough
v.
Outcalt et al.

aid of the court should be extended to the diligent creditor. If this case, and the cases relied on in support of it, as decided by Ch. Kent, are to be taken as extending beyond this, and reaching all equitable rights and choses in action in the hands of third persons, without fraud, will it not lead to this general proposition, that this court will take jurisdiction and give aid to the creditor in all cases where the debtor has property or rights which cannot be reached by execution at law; and that the creditor to whom this relief is afforded shall have preference to all others? The injunction case before mentioned, in which a judgment debt due the defendant was actually impounded for the benefit of the complainant, shows how naturally the power of this court expands itself, unless restrained by settled and fixed principles. If such a debt or chose in action could be brought within the power of the court, so as to be given to an execution creditor, why not a bond debt, a legacy, or even a liquidated claim upon simple contract? Where would the power cease? and what would become of the insolvent laws, the policy of which is to distribute property rateably for the benefit of all the creditors of the insolvent? This subject has lately been before the chancery of New-York, in the case of *Donovan* v. *Finn, Hopk.* 59. An attempt was there made to extend the power of this court, so as to reach a legacy in the hands of executors. Donovan recovered a judgment at law against Finn, and issued an execution, which was returned *nulla bona.* Finn was at the time entitled to a certain legacy left him by his brother, which was still in the hands of the executors, and there was property sufficient to satisfy it. The plaintiff at law filed a bill in equity against Finn and the executors of his brother, to have the execution satisfied out of the legacy. The court dismissed the bill, and placed itself on the ground, that where a party comes into this court to obtain satisfaction of a judgment, he must present himself under some head of equity jurisdiction: "he must show that the debtor has made some fraudulent disposition of his property, or that the case stands infected with some trust, collusion or injustice, against which it is the province of this court to give relief." And the chancellor very justly remarks, that "if the court should take cognizance of such cases, it would form a chapter of jurisdiction far more ample than

any one it now possesses, and the assumption would be a bolder stride of power than was ever made by the English chancery in any single age."

Considering, therefore, as I am inclined to do, that a party by his execution at law obtains no vested interest in mere equitable rights, such as this court will aid him in securing, unless they are connected with some fraudulent or colourable disposition of property; or some direct trust where the contract has been executed, and the cestui que trust is in a situation to call on the trustee for the property; or where there is a right of redemption, as in cases of pledges or mortgages; let us next inquire, whether the interest of Outcalt, which was sought to be affected by the execution, was of that character.

And in the first place, was there a fraudulent transfer, assignment, or transaction, between Outcalt and Pierson, whereby creditors were to be defeated? It appears that Outcalt contracted for a small unimproved property. It does not appear that he ever paid any part of the purchase money. It is proved that a part of it is included in the mortgage to Hardenburgh given by Pierson; and it was alleged on the argument, that another part of it is included in the mortgage given to Rutgers college by Pierson. This was not denied. I take, then, these matters to be true, and in the absence of all proof to the contrary, go on the principle that Outcalt paid no part of the purchase money. Then the contract was made by Outcalt, and for his own benefit. He was to reside there; he had the management of the property, and procured the consent of his son-in-law to take the deed for the property. Still Outcalt did not pay for the property, nor did he secure the payment. His creditors were not deprived of any thing. There was no assignment or transfer of property out of his own possession into the hands of another, for the purpose of defeating creditors. The deed, it is true, was made to Pierson; but then he had to pay for the land, and became personally bound. What, then, did Outcalt vest in Pierson? At most, nothing more than his contract, his right to purchase and procure a title, by paying the consideration; and this was upon condition that he should possess the property and use it. Outcalt improved the property, and rendered it valuable by the erection of mills, &c.; but at whose ex-

pense? It is not discovered that he ever paid a dollar for any of these improvements. The cost of them is secured by the personal bond of Pierson, accompanied with a mortgage on the property. The result then is, that Pierson, who was the son-in-law of Outcalt, and with whose circumstances we are totally unacquainted, took a title for the property, became responsible for the payment, and permitted his father-in-law to live on it and support himself and family if he could do so, and improve it for his benefit, he, Pierson, becoming personally responsible for the cost of the improvements. All this might take place in perfect good faith, and with the best motives. And, although there are some circumstances in this case calculated to excite suspicion, yet it does not present itself to my mind as a case of covinous conveyance or fraudulent trust; and, consequently, the court cannot interfere on that ground.

It remains, then, to be considered, whether Outcalt can be viewed as having an equity of redemption in this property. It is manifest he never had any legal right. The title of the property was never vested in him. He had, at most, a right to pay the incumbrances, and reimburse Pierson, and then call upon him for a conveyance. It amounted to a contract for the purchase of the property, on the payment of a certain consideration. This consideration was never paid, nor the contract executed on his part. Outcalt was never in a situation to call for a specific performance. This is not like the case of a mortgage or pledge. In England, an equity of redemption cannot be sold by execution at law; but the execution will give a lien which a court of equity will protect. All that prevents the execution from operating on the mortgaged property, is the incumbrance. That being redeemed in equity, the impediment being removed, and the legal estate fully restored, the execution would be effectual at law; but chancery being possessed of the case, does that which a court of law would do; it secures the preference of the execution creditor. But, suppose the money paid in this case, would the legal title be in Outcalt? Surely not: it would remain in Pierson. The estate of Outcalt would still be an equitable one, and not liable to be sold on execution; though it might then be reached

in equity, in the mode in which his present equity is sought to be affected.

I am of opinion, therefore, that this case does not come within the ordinary jurisdiction of the court; that there is no sufficient evidence of fraud; and that Outcalt had no such right or estate in the premises as will justify the interference of this court, so as to give a preference to the judgment creditor.

I have reached this conclusion without reference to the situation of the bank, who are purchasers from Pierson after the judgment against Outcalt, and before the sale. It is admitted that their money was appropriated for the improvement of the property before the sale. They took it to secure themselves, and are bound to pay off the incumbrancos. They offer the property to Disborough on payment of their demand. Disborough seeks to obtain it on payment of the incumbrances merely, to the exclusion of the bank; and if successful, the result would be, simply to transfer the money of the bank into his own pocket. This would certainly be hard equity against the bank, who, for aught we know, had no actual notice of the claim of Disborough at the time of their purchase.

As to the other lot of forty acres embraced in the deed, the facts appear to be these. In 1823, Griffin Taylor contracted to sell the lot to Outcalt for four hundred dollars. Half of it was paid in notes, and the deed was to be delivered when the money was all paid. In 1824, Taylor assigned his right in the article, and to the money due on it, to one William Gordon, and furnished Gordon with a deed to Outcalt, to be delivered when Outcalt should pay the balance of the purchase money. The deed was tendered, but Outcalt refused to pay. Gordon then assigned his right in the article to Disborough. The property in the possession of Outcalt was afterwards levied on, and the right of Outcalt sold, and purchased by Disborough.

This is not a bill for a specific performance. It does not seek that Outcalt shall be decreed to pay the two hundred dollars, on tendering the deed; but goes on the principle that the rights of Taylor and Outcalt are both vested in the complainant: the one by the asignment from Gordon, and the other by the judgment and execution or sale; and therefore that the court may decree

Taylor to make a deed to Disborough, and Outcalt to release all his interest in the property purchased. I do not see on what principle the court is to proceed in giving the relief prayed for. The complainant charges, that he has an equitable right to hold and enjoy the lands, *either* by virtue of the purchase, *or* under the assignment. It appears to me, that under the assignment he might probably have compelled a specific performance of the contract on the part of Outcalt ; but it certainly cannot be enforced in this suit. What right of Outcalt did he purchase under the execution ? or rather, what was the right on which the execution is sought to be made a lien? The right to compel a conveyance on the part of Outcalt, on paying the two hundred dollars due. This brings us back to the same principles already discussed, and will lead to the same results. The difficulty was attempted to be surmounted by the complainant's counsel, by showing that Disborough had not only the right under the execution and levy, but also the right of Taylor. But what was it that was transferred to Disborough by Gordon ? Not the legal right of the property. It was not in Taylor's power to assign that to Gordon, nor did he attempt to assign it ; and, of course, it could not be transferred from Gordon to Disborough. It was the right to receive the two hundred dollars from Outcalt, and to compel a performance of the contract ; and it is not perceived by the court how the possession of this right can aid the complainant in this cause.

Upon the whole case, I am of opinion that the complainant has failed to establish any equitable ground for relief, and that his bill must be dismissed.